## ASTRUC v. STAR CO.

(Circuit Court of Appeals, Second Circuit. February 1, 1912.)

No. 173.

1. **LIBEL AND SLANDER (§ 7*)—LIBELOUS PUBLICATIONS—"BOYCOTT."**

A newspaper article asserting that a citizen and resident of France, who by virtue of a contract with an opera company of New York to secure engagements for opera singers had an absolute monopoly of the engagement of French artists for the company, that no one could be engaged unless he acted as intermediary; that he was an autocrat, and held up contracts and boycotted the best singers, and commenting unfavorably on such a method of doing business, was not libelous; the word "boycott," not referring to the offense denounced by Penal Law (Consol. Laws N. Y. 1909, c. 40) § 580, but only referring to his failure to submit for engagement artists whom he did not approve.

[Ed. Note.—For other cases, see Libel and Slander, Dec. Dig. § 7.*

For other definitions, see Words and Phrases, vol. 1, pp. 855–856; vol. 8, p. 7592.]

2. **LIBEL AND SLANDER (§ 9*)—LIBELOUS PUBLICATIONS.**

A newspaper article asserting that the engagement of artists was based on favoritism and a financial arrangement touching commissions, that the case of an artist named, whose contract read for $1,000 a night, and who received $500, was an example, and that there were numerous cases of the kind, but that most artists were afraid of talking about them, was libelous per se, because charging him with procuring an engagement for the artist named on the basis of a financial arrangement touching commissions, and thereby tending to prejudice him in his business.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 80–90; Dec. Dig. § 9.*]

3. **EVIDENCE (§ 76*)—FAILURE OF PLAINTIFF TO TESTIFY.**

Where, in an action by a citizen and resident of France for libel, there was no reason why he should attend and testify in support of a prima facie case, or to testify on the question of the libelous charge, in view of evidence of defendant, the action of the court in allowing evidence of the steps taken towards obtaining the testimony of plaintiff who remained continuously abroad, and in charging that his absence was a circumstance that might be considered against him, was reversible error.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 96; Dec. Dig. § 76.*]

In Error to the Circuit Court of the United States for the Southern District of New York.

Action for newspaper libel by Gabriel Astruc against the Star Company. There was a judgment of the Circuit Court (182 Fed. 705) for defendant, entered on a verdict for defendant, and plaintiff brings error. Reversed.

---

†For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

This cause comes here upon appeal from a judgment of the Circuit Court, Southern District of New York, entered upon the verdict of a jury in favor of defendant in error, who was defendant below. The action was for an alleged libel concededly published in defendant's newspaper.

Maurice Leon, for plaintiff in error.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. Plaintiff is a French citizen and a resident of the city of Paris, where—and elsewhere in Europe—he has been engaged in business as intermediary to secure engagements for operatic singers and similar artists.

He had a contract dated October 21, 1908, with the Metropolitan Opera Company of New York, a private corporation, which was engaged in the business of giving operatic performances in this country. By this contract the Metropolitan Opera Company conferred upon him for a period of five years "the exclusive representation of its artistic and administrative interests in France, in Belgium and in the principality of Monaco." During that period he was by the contract "solely charged to negotiate the engagements of artists, singers, female singers, dancers, etc." He was given no authority to sign final contracts with them, without special authority, but no final contracts were to be signed (within his territory) with any such persons whose names he did not himself propose. By this arrangement, the company restricted itself to contracting with those persons only who had been approved and were recommended by the plaintiff. The contract recites that it was entered into "by reason of the services rendered by Mr. Gabriel Astruc since the year 1904 to the Metropolitan Opera Company."

[1] The plaintiff by the contract "engages himself not to charge upon the amount of the salaries of artists (and others) engaged or which may be engaged through his means a commission exceeding 5 per cent." On March 21, 1909, defendant published in its newspaper an article which it is not necessary to set forth in full. It stated that Astruc had an absolute monopoly of the engagement of French artists for the Metropolitan Opera House; that nobody could be engaged unless he acted as intermediary; that he was an autocrat, and held up opera house contracts and boycotted the best singers; that he boasted of his power, saying that he had a "little garden," and that every artist wishing to enter the Metropolitan Opera House must pass through his gate. The article commented unfavorably on such a method of doing business. Although this was expressed in a manner derogatory to the plaintiff, it was not libelous. "Boycotting" is made a crime in New York (N. Y. Penal Law, § 580 [Consol. Laws 1909, c. 40]), but it is quite apparent that in the article the word "boycott" was used not as referring to the offense covered by that section, but as a mere synonym of "holding up"—not submitting for engagement the names of any artists whom he did not approve.

[2] The article, however, contained the following sentences:

"What makes the situation more demoralizing in effect is the indication that the engagement of artists is based on sheer favoritism and a financial arrangement touching commissions. The case of the tenor, Rousseliere, whose contract read for a thousand dollars a night and who is said to have received five hundred, is an example. There are numerous other cases of the kind, but most of the artists are afraid of talking about them for fear of Astruc, whose sway is considered absolute."

About the meaning of this language there can be no possible doubt or uncertainty. It asserts positively and unambiguously that in the case of the tenor Rousseliere, and in numerous other cases, the plaintiff, having been intrusted by his principal with the power to accept or reject candidates for operatic engagements, used his power to extort from the applicants 50 per cent. of their entire salaries before he would make a favorable report upon such application. It might well be that such a charge would lead those who read it to believe that plaintiff was a contemptible person; and certainly it tended to injure him in his business or occupation. Other persons, wishing to secure an experienced person as their negotiator with foreign artists, would certainly not select a man who had, when similarly employed by some one else, abused his position by such acts of extortion. That words are actionable if they directly tend to the prejudice or injury of a person in his profession or business is well settled by authority. 18 A. & E. Encyclopedia of Law (2d Ed.) p. 942; 25 Cyc. 326.

We cannot agree with defendant's contention that the quoted statements are ambiguous, that they "do not say whether the plaintiff got the half salary from Rousseliere as a condition of getting him a contract or whether he received it from the opera company for negotiating a contract esteemed by the opera company to be a very valuable one." On the contrary, we think that an intelligent person, reading the whole article together, would reach no other conclusion than that plaintiff procured an engagement for the tenor upon the basis of a financial arrangement touching plaintiff's commissions, whereby the singer had to yield up one-half of his nightly payments.

We are of the opinion, therefore, that the court erred in refusing to charge the jury that the passage quoted was libelous per se, and in leaving it to the jury to say whether the article charged plaintiff with dishonest or improper conduct in his mode and manner of engaging and dealing with singers or others for the opera company. By the reservation of various exceptions plaintiff is in position to present this assignment of error.

[3] Inasmuch as there will be a new trial, we may call attention to another assignment of error. As to malice, damages, etc., the jury was correctly instructed. In the course of the charge, however, the court said:

"I will call your attention to the fact right here, lest I forget it, that Astruc has not appeared as a witness, has not given any testimony to contradict the evidence that has been given here on the other side and there is no reason given for his nonappearance. Now, where a witness who can appear, who is interested and who is a party and who could appear, when he fails to appear and give evidence as to the material facts and contradict evidence that

stands against him, that is a circumstance that may be considered by the jury, which may raise an inference in their minds and satisfy them that his evidence on that point, even if given, would not be favorable to him upon the issues framed in the case by the pleadings or by the evidence."

To this plaintiff reserved an exception. At the close of the proofs one of the defendant's attorneys took the stand, and was allowed to testify as to what steps he had taken towards obtaining the testimony of the plaintiff, who remained continuously abroad. This was objected to and exception reserved. It turned out that the testimony was not obtained because the federal courts do not allow examination of the plaintiff before the trial under the New York Code practice; and defendant did not undertake to secure the testimony on commission to examine absent witnesses, because he did not wish to make plaintiff defendant's witness. . This testimony had no relevancy to any issues before the court and should have been excluded. We are satisfied that such testimony coupled with the quotation from the charge supra must have operated to plaintiff's prejudice with the jury. We think it was error thus to charge, in view of the situation of the case.

Plaintiff resided abroad, and there was no reason why he should attend to testify at the trial unless it was to be expected that his evidence might be important or material. In support of his own prima facie case, it is conceded that he need not appear, but defendant contends that the answer contained charges which he was called upon to refute. But this is not so. These "charges" deal merely with the nonlibelous parts of the article—the agency of plaintiff, the large powers conferred on him by his principal, his exercise of those powers so that only such artists as he approved could get engagements, his statement that on the salaries of those whom he did secure he received a commission, his boastful reference to his authority when referring to his "little garden." There was nothing in this which he need cross the seas to contradict. It was a substantially accurate statement of his contract with the opera house company, and the necessary results of such a contract, which made him an "autocrat" in the matter of negotiating engagements. Touching the only libelous passage in the article the extortion of 50 per cent. commissions from Rousseliere and others the only "justification" pleaded in the answer is that every artist engaged by plaintiff was required to "pay to the plaintiff a large commission." If Astruc had never exacted from any one a commission in excess of what the opera house contract provided for he could safely remain absent from the trial, relying on the belief that no one competent to testify would commit perjury by swearing that he did so. There was nothing in the pleadings which called so imperatively for his presence at the trial as to warrant the instruction given to the jury. Nor was there anything in the testimony which called for it. No one testified to the exaction of a 50 per cent. commission from Rousseliere or from any one else. The defendant called the treasurer of the opera house and proved that Rousseliere was engaged at a salary of 5,000 francs a night— 120,000 francs in all, from which there was deducted a commission to

Astruc of 2½ per cent., $508.40 in all. Had plaintiff been present at the trial, there was nothing in defendant's case which it was necessary for him to rebut.

For these reasons, the judgment of the court should be reversed.